UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| FIC, L.P., individually, and on behalf of all others similarly situated, | No. 07 Civ. 11633-(AKH) ECF Case |
| Plaintiff, | **SECOND AMENDED VERIFIED DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BEAR STEARNS ASSET MANAGEMENT INC., RALPH CIOFFI, RAYMOND McGARRIGAL, MATTHEW TANNIN, BEAR STEARNS COMPANIES INC., BEAR STEARNS & CO. INC., WALKERS FUND SERVICES LIMITED, SCOTT LENNON, and MICHELLE WILSON-CLARKE | |
| Defendants, | |
| and | |
| BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE FUND, L.P., | |
| Nominal Defendant. | |

Plaintiff FIC, L.P. ("Plaintiff") by its undersigned attorneys, as for this Derivative

Complaint, herein alleges, upon personal knowledge as to itself and its own actions and upon

information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This is a derivative action brought by a purchaser of limited partnership interests

in Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund L.P. (the

"High-Grade Enhanced Fund" or the "Partnership") to recover for breaches of fiduciary duty

committed by the general partner of the High-Grade Enhanced Fund, Bear Stearns Asset Management ("BSAM"), and its managers, Ralph Cioffi, Raymond McGarrigal and Matthew Tannin (the "Management Defendants"), aided and abetted by other entities under the umbrella of the corporate parent, The Bear Stearns Companies Inc. ("BSC"), and purportedly independent directors of the Master Fund who failed to monitor BSAM's investments.

2.     The High-Grade Enhanced Fund collapsed on July 30, 2007, with the filing for bankruptcy protection in a Cayman Islands bankruptcy court by the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund ("High-Grade Enhanced Master Fund" or "Master Fund"), a Cayman Islands company in which the High-Grade Enhanced Fund invested all its assets.

3.     The Management Defendants formed and ran the High-Grade Enhanced Fund and another hedge fund, the Bear Stearns High-Grade Structured Credit Strategies, L.P. ("High-Grade Fund"). The High-Grade Fund was started in December 2004, and starting in June 2006, BSAM created the High-Grade Enhanced Fund by soliciting investors such as Plaintiff and also investors then in the High-Grade Fund. The High-Grade Fund, like the High-Grade Enhanced Fund, was a feeder fund that invested its assets, along with the assets of another fund for foreign investors, in a Cayman Islands master fund. The overseas counterparts of the High-Grade Fund and the High-Grade Enhanced Fund were Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (the "Overseas High-Grade Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (the "Overseas High-Grade Enhanced Fund").

4.     Ultimately, BSAM and the Management Defendants successfully raised $642 million from the Plaintiff and other limited partners to invest in the High-Grade Enhanced Fund.

5.     As the general partner and/or managers of the High-Grade Enhanced Fund, BSAM and the Management Defendants owed Plaintiff and other limited partners fiduciary duties of undivided loyalty, due care, utmost good faith and complete disclosure.   The Management Defendants had a duty to operate the High-Grade Enhanced Fund in accordance with these fiduciary duties and abide by the terms of the limited partnership agreement (the "LPA") for the High-Grade Enhanced Fund.

6.     However, BSAM and the Management Defendants instead ran the High-Grade Enhanced Fund for their own benefit and the benefit of their corporate parent, BSC.

7.     All Defendants improperly used the High-Grade Enhanced Fund as a garbage dump for BSC and its subsidiaries to unload troubled assets that were dragging down BSC's own balance sheet, and did so at inflated prices and without approval by any independent representative of the High-Grade Enhanced Fund.   This included almost $500 million BSAM caused the High-Grade Enhanced Fund to purchase from BSC in May 2007 (just as BSC was about to experience its first losing quarter in its 80 year history).

8.     Although BSAM and the Management Defendants were required to ensure the fairness of the related party transactions to the High-Grade Enhanced Fund, these defendants instead took steps to prevent any independent review of the related party transactions, either by an independent director or other representative of the High-Grade Enhanced Fund.

9.     Defendants further engaged in multiple schemes to hide the disastrous effects of this self-dealing.  First, Defendants hid liquidity problems of the High-Grade Fund to induce investors to become limited partners in the High-Grade Enhanced Fund, which BSAM stated would have a similar investment strategy to the High-Grade Fund.    At the time, BSAM represented that the High-Grade Fund was earning high returns.  In reality, its liquidity problems

were so severe, BSAM was worried that the High-Grade Fund could not meet its working capital requirements and even contemplated shutting down the High-Grade Fund.

10.    Second, Defendant BSAM, which valued the High-Grade Enhanced Fund's assets to determine its own fee and the value of the limited partners' capital account, inflated the worth of the Partnership's assets.  Because there was no readily available, liquid market for many of the Partnership's assets, BSAM was required to use its judgment to value the assets in good faith. While BSAM represented that it used sophisticated models to value such assets, in reality BSAM reported artificially inflated asset prices, which had the effect of inflating BSAM's fees and masking a decrease in the limited partner's capital account.

11.    Third, Defendants made false and misleading statements touting the Partnership's ability to withstand a downturn in the credit markets.   In reality, Defendants' self-dealing caused the High-Grade Enhanced Fund to undertake unwarranted and undisclosed risk.  Defendants' comforting statements hid the fact that BSAM was investing and leveraging its assets in ways that "virtually guaranteed" the Partnership would "implode if market conditions turned south," according to a *BusinessWeek* investigation.

12.    In fact, when the effects of BSAM's self dealing were too large to mask, the Partnership and the Master Fund imploded causing Plaintiff and other limited partners to lose substantially all the assets that they invested.  Following the collapse of the Partnership, there was a wave of regulatory action and litigation seeking to redress Defendants' illegal conduct.

13.    After obtaining documentation from BSAM (including internal emails) regarding the Master Fund's related party transactions, the Massachusetts Secretary of the Commonwealth on November 14, 2007, commenced an action against BSAM alleging that 79% of these related party transactions during 2006 were not disclosed to investors and approved by independent

directors, as required by Section 206(3) of the Investment Advisers Act of 1940 and the LPA. *See* Administrative Complaint in *In the matter of Bear Stearns Asset Management, Inc.*, Dkt. No. E-2007-0064 (Mass.) (the "Massachusetts Action.").

14.     On December 19, 2007, Barclays Bank PLC ("Barclays") commenced an action in this Court against BSAM, the Management Defendants, BSC and its subsidiary Bear, Stearns & Co. Inc. ("BS&Co") alleging fraud, misrepresentation and breach of fiduciary duties (and corresponding aiding and abetting claims) to Barclays, which provided financing for the High-Grade Enhanced Fund. *See Barclay's Bank PLC v. Bear Stearns Asset Management Inc., et al.*, No. 07 Civ. 11400 (LAP) (S.D.N.Y.) (the "Barclays Action").

15.     On April 4, 2008, certain liquidators appointed by the Cayman Islands bankruptcy court commenced an action in this Court titled *Varga v. Bear Stearns Asset Management*, No. 08 Civ. 03397 (BSJ) (S.D.N.Y.) seeking recovery on behalf of investors in the Cayman Islands feeder funds, the Overseas High-Grade Fund and the Overseas High-Grade Enhanced Fund (the "Overseas Liquidators Action").

16.     Criminal investigations are proceeding in addition to the civil actions.  The *Wall Street Journal*, *Bloomberg* and *BusinessWeek* have each reported that the U.S. Attorney's Office for the Eastern District of New York and the SEC are investigating the collapse of the High-Grade Enhanced Fund and the High-Grade Fund.  The inquiries include an investigation of Management Defendant Ralph Cioffi's redemption of $2 million (roughly one-third) of his personal holdings in the High-Grade Enhanced Fund prior to the collapse.  According to *BusinessWeek*, the "redemptions occurred, sources say, during a time when the funds' managers were urging other investors to stay put."

17.     According to a June 16, 2008 *Wall Street Journal* article, charges by federal prosecutors against Cioffi and Tannin are "imminent" for, *inter alia*, providing a "rosy picture of the funds at a time when they were privately communicating with colleagues about their worries over how the investment vehicles would ride out weakness in the mortgage market."

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.  The Court has personal jurisdiction over Defendants because Defendants committed material events giving rise to this action in this District and Defendants systematically and continuously conduct business in this state and maintain offices within this District.

19.     Venue is proper in this District under 28 U.S.C. §1391 because Defendants engaged in substantial conduct relevant to Plaintiff's claims within this District.

## THE PARTIES

20.     Plaintiff FIC, L.P. is a limited partnership, and is a citizen of California.  Plaintiff is the legal and beneficial owner of a limited partnership interest in the Partnership.

21.     Defendant BSAM is a corporation organized under the laws of the State of New York with its principal place of business at 383 Madison Avenue, New York, New York.  BSAM is the General Partner of the High-Grade Enhanced Fund and Investment Manager of the Master Fund.

22.     Defendant BS&Co is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York. BS&Co acted as placement agent to the High-Grade Enhanced Fund.

23.     Defendant BSC is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York, and is the parent of BSAM and BS&Co.  On May 30, 2008, BSC was acquired by JPMorgan Chase & Co.

24.     Defendants BSC and BS&Co are collectively referred to herein as the "Non-Management Defendants."

25.     Defendant Ralph Cioffi ("Cioffi") acted as Senior Portfolio Manager for the High-Grade Enhanced Fund and the Master Fund.  Cioffi had been with Bear Stearns since 1985, and was a member of BSAM's Board of Directors and a Senior Managing Director of BSC until he left on November 28, 2007.  Cioffi is a citizen of New Jersey.

26.     Defendant Ray McGarrigal ("McGarrigal") acted as Portfolio Manager for the High-Grade Enhanced Fund and the Master Fund.  McGarrigal is also a Managing Director for BSAM.  McGarrigal is a citizen of New York.

27.     Defendant Matthew Tannin ("Tannin") acted as the Chief Operating Officer of the Partnership and of the Master Fund.  Tannin is a Senior Managing Director of BSAM. Tannin is a citizen of New York.

28.     Defendants BSAM, Cioffi, McGarrigal and Tannin are collectively referred to herein as the "Management Defendants."

29.     Defendant Walkers Fund Services Limited ("Walkers") is a Cayman Islands company with its principal office located at Walker House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands. Walkers is a licensed trust company and investment fund administrator, which provides a full range of services to offshore investment funds, including but not limited to, providing directors, administrative, and trustee services. Walkers provided

services to the Master Fund, including but not limited to, providing the Independent Directors Defendants to the Master Fund and performing administrative tasks such as collecting and disseminating valuation information to Limited Partners. Despite its commitment to provide the Master Fund with independent directors, Walkers had close financial ties to a number of Bear Stearns entities. During the relevant period alleged herein, Walkers provided similar services to at least 9 BSAM hedge funds other than the Master Fund. Additionally, a Walkers-affiliated law firm served as legal counsel to at least 16 Bear Stearns hedge funds that BSAM advised, including the Master Fund.

30.     Defendant Scott Lennon ("Lennon") is a resident of the Cayman Islands. Mr. Lennon was at all relevant times a Senior Vice President of Walkers, a Cayman Islands trust company and investment fund administrator. Beginning in or about August 2006, Mr. Lennon was one of two purportedly independent directors of the Master Fund responsible for objectively evaluating related-party trades and transactions on behalf of the Partnership and the Master Fund -- a responsibility that he ignored.

31.     Defendant Michelle Wilson-Clarke ("Wilson-Clarke") is a citizen of the United States and a resident of the Cayman Islands. Ms. Wilson-Clarke was at all relevant times a Vice President of Walkers. Beginning in or about August 2006, Ms. Wilson-Clarke was one of two purportedly independent directors of the Master Fund responsible for objectively evaluating related-party trades and transactions on behalf of the Partnership, Limited Partners, and the Master Fund – a responsibility that she ignored.

32.     Defendants Lennon and Wilson-Clarke are referred to herein as the "Independent Director Defendants." Lennon, Wilson-Clarke, and Walkers will be referred to as the "Walkers Defendants."

## FACTUAL BACKGROUND

33.     The High-Grade Enhanced Fund was formed as a Delaware limited partnership on June 9, 2006.   The limited partnership interests offered through the High-Grade Enhanced Fund's Private Placement Memorandum ("PPM") were private offerings pursuant to exemptions provided by Section 4(2) of the Securities Act of 1933, Rule 506, and applicable state securities laws.   BSAM is the general partner of the Partnership.   Plaintiff and other limited partners entered into one or more subscription agreements whereby they collectively invested over $600 million in the Partnership.

**I.     The Management Defendants Create and Market the High-Grade Enhanced Fund**

**A.     Investors in the High-Grade Fund Were Encouraged to Invest in the Enhanced High-Grade Fund**

34.     In October 2003, Management Defendants BSAM and Tannin, among others, created the High-Grade Fund and High-Grade Overseas Fund.   Both funds served as feeder funds for the High-Grade Master Fund.   Investors were solicited to invest in the funds, which then in turn invested in the High-Grade Master Fund.   Investors in the High-Grade Fund and High-Grade Overseas Fund received a return on investment depending on whether the High-Grade Master Fund rose or fell in value.

35.     To outside investors, it appeared that the High-Grade Master Fund earned healthy returns.   By August 2006, the High-Grade Master Fund earned 36% returns.   In January 2007, it reported no declines in 40 months and earned a total cumulative return of 50%.

36.     In an attempt to capitalize on the apparent success of the High-Grade Master Fund, BSAM solicited investors in the High-Grade Funds to roll over their investments into two new funds, the High-Grade Enhanced Fund and High-Grade Enhanced Overseas Fund.   These

funds had a master-feeder structure as well, where investments in the High-Grade Enhanced Fund rose or fell with the value of the High-Grade Enhanced Master Fund.

37.     The Management Defendants represented that they would use the same investment expertise used to grow the High-Grade Master Fund in managing the High-Grade Enhanced Master Fund.

**B.      Barclays Acts as "The Leverage Instrument Counterparty"**

38.     The High-Grade Enhanced Fund was different from the High-Grade Fund in one important aspect: the High-Grade Enhanced Fund invested in the Master Fund on a leveraged basis.

39.     Barclays provided the additional leverage.  The PPM states:

> The Partnership will enter into an over-the-counter, *total return swap* (the "Leverage Instrument") with Barclays Bank PLC as counterparty (the "Leverage Instrument Counterparty"), which references the Master Fund. . . .  The Partnership will pay the Leverage Instrument Counterparty an amount equal to substantially all the proceeds from the issuance of the Interests and will receive a return indexed to an investment in the Master Fund with a targeted leverage of 2.75 times the amount invested.

(Emphasis added.)

40.     Barclays hedged its commitment to pay the Partnership if the High-Grade Enhanced Fund went up in value by purchasing an interest in the Master Fund.

41.     To simplify, the total return swap and hedging strategy was the functional equivalent of a loan; Barclays loaned the High-Grade Enhanced Fund money to invest in the Master Fund on a leveraged basis.

42.     Because Barclays invested money in the Master Fund, Barclays was entitled to disclosures that limited partners were not entitled to.  The PPM stated:

> In accordance with the terms of the Leverage Instrument and in consideration of the credit exposure of the Leverage Interest Counterparty to the Master Fund investment portfolio, to the extent that the Leverage Instrument Counterparty

invests in the Master Fund to hedge its obligations under the Leverage Instrument, it will be entitled to more frequent and detailed information reports and more favorable liquidity rights than the Limited Partners have with respect to their Interests.   Any such agreement between the Master Fund or the Investment Manager and the Leverage Interest Counterparty will not entitle any other Limited Partner to any more favorable rights with respect to its investment in the Partnership.

43.   In addition, the PPM stated that the Master Fund intended to follow certain investment guidelines that limited risk because Barclays could otherwise terminate the Leverage Instrument.  The PPM stated:

> The Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion.  In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

44.   Specifically, BSAM agreed to limit the Master Fund's investment in lower-rated or unrated securities and agreed to limit the total leverage of the Master Fund.  The PPM stated:

> The Investment Manager generally intends therefore (but is in no way obligated) to comply with such limitations, including limitations on the Master Fund's exposure to Repackaging Vehicle Junior Interests, limitations on the securities that the Master Fund may hold that are rated below AA by Standard & Poor's or Fitch or Aa2 by Moody's and limitations on the Master Fund's exposure to certain categories of structured finance securities, including CDO Securities, ABS Securities and residential mortgage-backed securities.  A copy of the Leverage Instrument, including such limitations, will be made available to Limited Partners and prospective investors upon request to the General Partner, subject to any confidentiality requirements imposed on the Partnership.

45.   BSAM promised Barclays that it would invest no more than 60% of the portfolios' assets in so called collateral debt obligations ("CDOs").  *See infra* ¶ 44.  BSAM also promised Barclays that the Net Leverage of the Master Fund would be no greater than 2850% of the Master Fund's Net Asset Value ("NAV").  Further, depending on the amount of leverage, the Master Fund agreed to limit its holdings of lower rated securities.  For example if Net Leverage

was below 2000% of NAV, the Fund could hold 3.5% percent of its total assets in below BBB-

or non-rated securities.

### C.    BSAM's Investment Strategy

46.    According to the PPM: "The primary objective of the Partnership is to seek high

current income and capital appreciation relative to LIBOR."

47.    The PPM indicated that the Partnership would invest in so-called "Repackaging

Vehicles:"

> While the Master Fund's investment objective may be achieved through direct,
> leveraged investments in investment grade structured finance securities and other
> structured finance assets, the Master Fund intends, as part of its strategy, to gain
> exposure, on a non-recourse, leveraged basis, to investment-grade structured
> finance securities … (such as CDOs)…. Each such structured vehicle is referred
> to herein as a "Repackaging Vehicle." The Investment Manager or an affiliate
> thereof may, but need not, be the collateral manager or similar service provider
> with respect to a Repackaging Vehicle (each a "Repackaging Vehicle Manager").

48.    In other words, the High-Grade Enhanced Master Fund purchased investment

grade CDOs on a leveraged basis. CDOs are issued by special purpose vehicles ("SPVs") to

purchase debt assets such as mortgage backed securities ("MBS") and asset backed securities

("ABS"). CDO holders have a right to a certain amount of the interest and principal of the assets

held by the SPV.

49.    An SPV generally issues multiple tranches of CDOs, with different levels of

seniority. If some of the MBSs or ABSs held by the SPV do not generate income, for example

because of an increased rate of loan default, then holders of senior CDOs will receive the interest

and principal payments due to them before holders of the junior interests. The PPM states:

> Structured finance securities are the securities of special purpose vehicles
> ("SPVs") that purchase diversified pools of assets. The assets held by the SPV
> are financed through the issuance of several classes, or tranches, of securities each
> of which has a specific right to the interest and principal payments from the
> underlying diversified pool of assets held by the SPV. Each of the tranches issued
> by an SPV has a credit quality rating that is determined by the tranche's

repayment priority to the interest and principal payments generated by the underlying assets. The Master Fund will focus on the senior securities issued by SPVs that are rated from AAA to AA- by Standard & Poor's, from Aaa to Aa3 by Moody's or from AAA to AAA- by Fitch.

50.     In addition to these higher-rated securities, the Master Fund also invested in so-called Repackaging Vehicle Junior Interests, which were not investment-grade securities. The PPM stated:

> As part of the Master Fund's investment strategy, the Investment Manager intends, subject to market conditions and other relevant factors, to invest up to 40% of the Net Asset Value of the Master Fund, as measured at the time any investment is made, in equity tranches (or equivalent securities) of Repackaging Vehicles (the "Repackaging Vehicle Junior Interests"), subject to the portfolio guidelines imposed by the Leverage Instrument, which may restrict such holding significantly less than 40%. The returns of the Repackaging Vehicle Junior Interests will be generated primarily from the cash flow performance of the investment-grade ABSs, investment-grade CDOs and other investment-grade assets selected by the Investment Manager in its capacity as collateral manager of the Repackaging Vehicles.

51.     The PPM stated that the Master Fund would limit its investment in Repackaging Vehicle Junior Interests:

> Outside of the portfolio guidelines imposed by the Leverage Instrument, the Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA by Standard & Poor's, from Aaa to Aa2 by Moody's or from AAA to AA by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated. The Investment Manager intends, however, to adhere to the portfolio guidelines set forth in the Leverage Instrument in managing the assets of the Master Fund, thereby limiting its discretion. In certain instances, such adherence may cause the Investment Manager to forego certain investment opportunities that the Investment Manager believes may otherwise benefit the Master Fund.

52.     The Master Fund used leverage to purchase the investment grade securities.  The PPM stated: "As the Master Fund purchases highly rated investment-grade assets, the Master Fund will be capable of using leverage to invest in securities (excluding Repackaging Vehicle Junior Interests) with an aggregate value of as much as fifteen times the Net Asset Value of the Master Fund."

53.     Additionally, investment in Repackaging Vehicle Junior Interests exposed the High-Grade Enhanced Master fund to additional leverage.  The PPM describes the difference between the traditional leverage used by the High-Grade Enhanced Master Fund to purchase investment grade securities and the additional exposure to leverage caused by purchasing Repackaging Vehicle Junior Interests:

> Traditional leverage used in repurchase agreement financing is sensitive to the market price volatility of the assets being financed.  If the market price of the assets being financed deteriorates, the Master Fund may be required to post additional margin or, if sufficient margin is not available, may be required to sell a financed position.  This form of financing is typically called "mark-to-market recourse financing" because the repurchase counterparty uses the mark-to-market price of the financed assets to determine whether to call for additional margin.  Under the arrangements for such financing, the repurchase counterparty has recourse to the assets of the Master Fund used to secure financing.  The leverage inherent in the Repackaging Vehicle Junior Interests, by contrast, may be characterized as "non-mark-to-market" and "non-recourse," as the Repackaging Vehicle does not have the right, upon the deterioration of the market price of its assets, to require additional capital from, and generally has no recourse to the assets of, the holders of Repackaging Vehicle Junior Interests.  The initial Repackaging Vehicle Junior Interest capital contribution required by a Repackaging Vehicle is determined by, among other factors, the ratings quality and diversity of the assets held by the Repackaging Vehicle.  If the total par amount of assets purchased by a Repackaging Vehicle were divided by the initial capital contribution of the Repackaging Vehicle Junior Interests, the result would be a leverage ratio of approximately 60-to-1.  This mathematical ratio is substantially greater than both the gross leverage and Net Leverage ratios targeted by the Master Fund for the portion of its investment portfolio that does not include the Repackaging Vehicle Junior Assets.  The Investment Manager anticipates, however, that the risk-adjusted return of Repackaging Vehicle Junior Interests will generally exceed the risk-adjusted return on assets financed under repurchase agreements or other forms of financing.

54.     Excluding the leverage inherent in purchasing Repackaging Vehicle Junior Interests, the PPM indicated that the upper limit of the leverage of the Partnership as 27.5 times and no more than 41.25 times the Net Asset Value of the Master Fund (when applying the 2.75 times leverage used with the Barclay's Bank leverage instrument):

> In addition to the leverage employed by the Partnership through the Leverage Instrument, the Master Fund itself will borrow money to enable it to invest in securities whose market value exceeds 100% of the Net Asset Value of the Master Fund. As the Master Fund purchases primarily highly rated investment-grade assets, the Master Fund will be capable of using leverage to invest in securities (excluding Repackaged Vehicle Junior Interests) with an aggregate value of as much as fifteen times the Net Asset Value of the Master Fund. It is the intention of the Investment Manager, however, to limit the Net Average to ten times the Net Asset Value.

55.     In addition to Repackaging Vehicles, the PPM stated that the Master Fund would also make other types of investments:

> The Master Fund will make investments in other structured finance assets including asset-backed securities ("ABSs"), synthetic ABSs, mortgage-backed securities ("MBSs") and global structured asset securitizations. In addition, the Master Fund may invest in (or otherwise take on risk) in both the traditional "cash" market and the derivatives market. In addition, the Master Fund may invest in various derivatives, including primarily credit-default swaps, but also options, swaps, swaptions, futures and currencies.

56.     BSAM represented that it would engage in hedging transactions to reduce exposure to market volatility and short term interest rate changes. The PPM states:

> Credit default swaps will be used by the Master Fund to hedge credit exposure. A substantial portion of the Master Fund's credit default swap hedges may be general portfolio hedges that do not hedge a specific asset held by the Master Fund.
>
> The Master Fund will also use other instruments and strategies to hedge potential market volatility. These instruments and strategies include options, futures and short positions on various financial indices or individual securities where the managers believe there is an opportunity to limit volatility in a negative market scenario.

57.     As a result of its investment and hedging strategies, the PPM stated:

The performance of the Master Fund will be related to trends in the credit markets, but the Investment Manager believes the Master Fund will not be highly correlated to short-term equity market returns.   Additionally, the Master Fund intends to construct a portfolio that minimizes correlation with short-term equity market returns.

**D.     BSAM was the General Partner of the Partnership and Investment Manager to the Master Fund**

58.     BSAM, as General Partner and Investment Manager, received an advisory fee in the amount of approximately 2% of each limited partner's capital account.  In addition, BSAM received a "profit share" in an amount equal to 20% of "Net New Income" as measured by the increase in each limited partner's capital account from its previous "high water mark" for the prior period.

59.     The PPM described the duties of BSAM in its role as investment manager:

The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund.   Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle.   These tools are derived from internally constructed, broker dealer and third party vendor analytical systems.   The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.

\*          \*          \*          \*

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund.   The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities.  Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way.

60.     To execute this strategy, the PPM stated that the Management Defendants would use their research expertise to execute the Partnership's strategy:

The Investment Manager will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively. A significant portion of the investment return of the Master Fund is expected to be current income resulting from a positive yield spread between the investment income of the investments (together with any corresponding hedging instruments) of the Master Fund and the associated borrowing costs. Additionally, to the extent that the Master Fund's assets increase in value, the Master Fund may realize capital appreciation.

**E.**     <u>**Limited Partners' Rights**</u>

61.     The Partnership did not intend to make distributions to limited partners. Rather, limited partners would earn profits as their capital accounts in the Partnership grew. Unless BSAM stated otherwise, limited partners could withdraw their investment and profit in the Master Fund in certain circumstances.

62.     The PPM provides certain procedures for the withdrawal of funds from a limited partner's capital account. Upon 40 days written notice, a limited partner may withdraw all or a portion of its capital account and incur a 2% fee. Periodic withdrawals without penalty were provided on a quarterly basis with 60 days written notice. The General Partner had the ability to waive these requirements.

63.     However, if the withdrawal requests exceeded 25% of the Net Asset Value of the Master Fund, the General Partner could elect to limit the withdrawals to 25% of the net aggregate value of the Master Fund. These provisions were also waivable by the General Manager.

64.     To enable limited partners to monitor their investments, the PPM provided that "Limited Partners will receive monthly account statements, audited financial statements, and necessary federal tax information for the Partnership."

**F.     BSAM had Discretion to Value the Fund's Assets**

65.     The PPM stated that BSAM valued assets of the Master Fund in accordance with GAAP.

66.     For some assets, there was a market in which the asset traded and BSAM merely determined what similar assets had been sold for on the market to determine its value.  This method of accounting is known as mark-to-market accounting.

67.     For other assets, such as Repackaging Vehicle Junior Interests, there was no market.  The PPM stated that BSAM valued these assets by using a fair-value methodology.  According to the PPM:

> This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle.

68.     There was no market for approximately 63% of the Master Fund's assets.  The PPM stated:

> The General Partner is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Partnership as a whole, such valuation is not open to challenge by current or previous investors.

69.     The PPM did, however, disclose that because BSAM received a percentage of the appreciation in the Master Fund's net asset value, there was an inherent conflict of interest in BSAM valuing the Master Fund's assets.  The PPM stated:

> The fees payable to the General Partner are based directly on the Net Asset Value of the Partnership as of various dates.  There may be no public market price for a portion of the Partnership's assets.  The General Partner will generally value the Partnership's assets.  Any financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the General Partner.  The General Partner will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Partnership and thus the amount of the Advisory Fee and Profit Share that the General Partner receives in respect to its services.

## DEFENDANTS' BREACH OF FIDUCIARY DUTIES

70.     Each of the Defendants owed fiduciary duties to the Plaintiff and other limited partners, by operation of Delaware law governing limited partnerships and by operation of the LPA.  The Management Defendants, aided and abetted by the Non-Management Defendants, willfully breached these fiduciary duties as set forth below and breached the terms of the LPA.

## I.     Defendants Hid Liquidity Problems of the High-Grade Fund

71.     To investors weighing whether to participate in the High-Grade Enhanced Fund, it appeared that BSAM had discovered a successful investment strategy judging by the returns generated by the High-Grade Fund.  As stated above, the High-Grade Fund was growing at a fast rate and had not suffered a loss in many months.  Thus, the following statement from the PPM gave investors comfort: "BSAM also operates [the High-Grade Master Fund], an investment vehicle which has an investment strategy similar to that of the Master Fund . . . ."

72.     However, Defendants kept hidden the real reason that the High-Grade Enhanced Fund was started: by at least September 2006, the High-Grade Fund Master Fund was experiencing liquidity problems and BSAM needed additional cash to continue to operate the High-Grade Master Fund.  Hedge funds like the High-Grade Fund need cash to pay interest on loans, meet margin requests when their investments decline, compensate investors when they withdraw money, make new investments, and pay other expenses.

73.     In a September 18, 2006 email Tannin wrote to Cioffi:

We need a certain amount of unencumbered assets to satisfy our working capital requirements.  These assets need to be "repoable" away from Bear . . . Where do the "surprise" needs for cash come from?

74.     A repurchase or "repo" is similar to a secured loan except that the lender takes title of the collateral and the borrower agrees to repurchase the collateral some time in the future.

Repos enable hedge funds to leverage their assets.  Where there is a margin call or a default on the terms of the repo agreement, the lender has the power to sell the asset.

75.    Indeed at the time, BSC placed a moratorium on trades with BSAM because BSAM did not comply with its duty to submit related party transactions to independent directors as required by law and the LPA.    *See* Section II *infra*.  This moratorium, undisclosed to investors, contributed to the High-Grade Fund's lack of liquidity because BSC was an important source of leverage.

76.    The Management Defendants induced Barclays to provide additional leverage for a new fund, the High-Grade Enhanced Master Fund.  Because Barclays was willing to provide large amounts of cash, Cioffi viewed Barclays as "an easy liquidity source."

77.    The liquidity problems at the High-Grade Fund were so great that on September 17, 2006 Cioffi suggested closing down the High-Grade Fund and asking investors to switch to the High-Grade Enhanced Fund to take advantage of Barclays' cash infusion.

78.    In an email to Tannin, Cioffi stated:

What I was thinking was to build up 6 [months] of returns then send a letter to all the remaining investors and tell them we are closing the [High-Grade Fund] and ask everyone to convert to [the Enhanced Fund].  We'd have to handle it like we did thru an exchange of assets[.]  I would not want to have to sell everything. This is the riskiest way to go because you know some [limited partners] will not convert but I feel comfortable that we can get almost all of them to.

79.    However, rather than completely shut down the High-Grade Master Fund, BSAM solicited investors in the High-Grade Fund to roll over their money in the new High-Grade Enhanced Fund.  As a result of investors deciding to roll over their assets into the new fund, on August 1, 2006, the High-Grade Master Fund transferred 36.74% of its assets to the High-Grade Enhanced Master Fund.

80.    The PPM described the transaction:

It is expected that on the initial closing of the Partnership, substantially all of the investments will be made by existing investors in [the High-Grade Fund], an investment vehicle which has an investment strategy similar to that of the Partnership, which investments will be made, directly or indirectly in exchange for an in-kind contribution of assets from the [High-Grade Fund] to the Partnership.

## II.    Defendants Engaged in Self Dealing Transactions to Enrich Themselves at the Expense of Plaintiff and other Limited Partners

81.    BSAM was motivated to invest in risky securities in a manner wholly at odds with prudent management of Plaintiff's and other limited partners' investments. BSAM earned fees as a manager of SPVs that issued CDOs. Further, BS&Co earned fees acting as an underwriter in CDO offerings. The Administrative Complaint stated: "Investors in the BSAM Funds were exposed to more conflicts of interest than investors in most other hedge funds. The BSAM Funds invested in [SPVs] structured by the managers of the Funds themselves, bought and sold securities from those [SPVs] and bought and sold securities from the affiliated broker-dealer Bear Stearns & Co." Administrative Complaint at 2.

82.    Where BS&Co and BSAM could not find a purchaser for CDOs that it helped issue, it caused the Master Fund to purchase the illiquid investments. This enabled both BSAM and BS&Co to earn fees by creating CDOs that no independent third party would purchase.

83.    Additionally, BSAM caused the Master Fund to make purchases in CDO-squared offerings, which were extremely risky and prohibited by the investment guidelines in the Leverage Instrument BSAM negotiated with Barclays, according to allegations in the Barclays Action. CDO-squared offerings are issued by SPVs that purchase CDOs. The purchasers in a CDO offering gain exposure to the CDOs purchased by the SPV. BSAM caused the Master Fund to make the following purchases in CDO-squared offerings:

(a)    February 2007: Purchase of $140 million in a CDO-squared offering underwritten by BS&Co.

   (b)  April 2007: Purchase of $150 million in a CDO-squared offering managed by BSAM.

   (c)  May 2007: Purchase of $500 million in a CDO-squared offering managed by BSAM and underwritten by BS&Co.

84.    These CDOs were priced by Bear Stearns-related entities and purchased by BSAM. Thus, there was no arms-length negotiation to determine the price that the Master Fund would pay for the CDOs.

85.    The April 2007 purchase was especially egregious because BSAM purchased <u>all</u> the securities in all the tranches of the CDO-squared offering. Besides the fact that the CDO-squared offering generated fees for BSAM, there was no reason why the Master Fund should not have merely purchased the underlying CDOs purchased by the SPV that offered the CDO-squared securities.

86.    Likewise, the May 2007 purchase involved BSC unloading securities to the Master Fund in the six riskiest tranches of the CDO-squared offerings.

87.    While BSAM had procedures to prevent mismanagement through self dealing, these procedures were not followed. According to the PPM, independent directors would approve all transactions "involving significant conflicts of interest." However, the Administrative Complaint documents numerous instances where conflicted transactions were never brought to the attention of independent directors or disclosed to independent directors *after* the transaction was completed. According to the Administrative Complaint, in 2006 78.95% of transactions that required approval from directors unaffiliated with Bear Stearns did not get such approval.

**III.** **Defendants Inflated the Value of the Fund to Create the Illusion of Profits and Increase their Fees**

88.     As stated above, BSAM had a duty to value the Master Fund's assets in good faith.  However, BSAM breached this duty by intentionally inflating the value of the Master Fund's assets to (1) increase its fees and (2) hide the fact that it overpaid for assets in self dealing transactions with other BSC entities.

89.     For securities where there was no market, BSAM failed to check their models for valuing such securities against actual purchases or sales of similar security, as required under GAAP.  Thus BSAM's valuations were arbitrary and self serving.

90.     Specifically, as the value of CDO's fell worldwide in late 2006 and 2007, BSAM did not sufficiently reduce its valuations of these assets.  Because BSC-related companies had constant access to buyers and sellers of similar securities, BSAM knew or should have known that its valuation of the Master Fund's assets was greatly inflated.

**IV.** **The Walker Defendants Knowingly Assisted the Management Defendants To Breach Their Fiduciary Duty**

91.     Further, at all relevant times, the so-called independent directors of the Master Fund who had a duty to approve the conflicted transactions were not actually independent.

92.     The PPM stated: "Members of the Board of Directors [of the Master Fund] who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Master Fund will have the responsibility for approving any transactions between the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest."

93.     In the PPM, Lennon and Wilson-Clarke were listed as the only two independent directors of the Master Fund.

94.     However, Lennon was senior vice president at Walkers and Wilson-Clarke was a vice president at Walkers.

95.     Walkers had a long and lucrative relationship with Bear Stearns. Walkers served as legal counsel to at least 16 Bear Stearns hedge funds that BSAM advised, and Walkers provided fund services for at least nine of BSAM's own funds. BSAM selected Walkers to perform services for the Master Fund that would ultimately be paid for by the Partnership and the other feeder funds. In this case, Walkers was retained to provide independent directors to the Master Fund.

96.     By its retention in the summer of 2006, Walkers was aware or should have been aware of the problems with approvals of related-party transactions. As a global provider of hedge and mutual fund services, including providing independent directors, Walkers was or should have been aware of Section 206(3) of the Investment Advisers Act.

97.     Nevertheless the Walkers Defendants completely neglected their duties to the Master Fund, the Partnership and to other feeder-funds. Of the transactions that required approval in 2007, 78.95% did not have approval. Furthermore, the Independent Director Defendants approved 165 related party transactions whose applications were either incomplete or were submitted after the transactions were completed.

98.     Had any of the prices, asset composition, values, volume, or credit-risk of the Master Fund's investments been independently examined, the Master Fund would not have become the primary purchaser of Bear Stearns' otherwise illiquid securities.

99.     The Master Fund frequently engaged Bear Stearns entities as lending counter-parties in the repo agreements used to create leverage. Repo agreements involved the Master Fund transferring collateral and making margin payments if the posted collateral decreased in

value.  In other words, Bear Stearns, as counterparty, was assigning actual monetary values for the asset-collateral and monitoring changes to its value.  Had the Independent Directors examined the repo agreements between Bear Stearns and the Master Fund, they could have discovered that Bear Stearns was valuing the assets differently than the BSAM Defendants' manager-marks.

100.    Independent review of related-party transactions also would have uncovered that the Management Defendants were causing the Master Fund to abandon its measured approach to investing in AAA/AA securities.  Over the life of Master Fund, Bear Stearns entities engaged in literally hundreds of transactions with the Master Fund.  On information and belief, meaningful examination of these transactions would have uncovered that the Master Fund was increasingly investing in junk or unrated securities.

101.    Finally, and most importantly, meaningful Independent Director review would have instantly uncovered the Management Defendants' nearly compulsive investments on behalf of the Master Fund in risky CDO securities issued by Bear Stearns and backed by subprime debt.

102.    As discussed at length herein, the Master Fund, by design, was permitted to invest in structured finance securities and Repackaging Vehicle Junior Interests arranged and managed by BSAM and other Bear Stearns entities.  When the Management Defendants increasingly began to direct the Master Fund to junk and unrated CDO securities, a review of the transactions by the Independent Directors would have uncovered that the Management Defendants were investing outside the parameters of the PPM and breaching their contractual and fiduciary duties to the limited partners and the Partnership.

103.    In addition, the Independent Director Defendants would have discovered that by fall 2006, the Management Defendants had turned the Master Fund into a *de facto* purchaser of

last-resort (and, likely the only "willing" buyer) for troublesome equity securities backed by subprime debt issued by Bear Stearns entities.

104.    The Partnership hired Walkers to provide another level of oversight over the Master Fund. Among other things, Walkers wholly failed to perform its duties to the Limited Partners and Partnership and allowed the Management Defendants' breaches of fiduciary duty to occur.

105.    Walkers knew that it was providing directors (Defendants Lennon and Wilson-Clarke) to the Master Fund whom the PPM would name as independent directors that would approve all related party transactions between the Master Fund and any Bear Stearns entity and that their employees were intended at all times relevant hereto to be in contact by phone, regular and electronic mail and/or were intended to or did meet with the BSAM employees located in New York regarding related-party transactions between the Master Fund and Bear Stearns entities located in New York.

106.    The Walkers Defendants knew or should have known that U.S. investors had an interest in the Master Fund and they were intended at all times relevant hereto to be in contact by phone, regular and electronic mail and/or were intended to or did meet with the BSAM employees located in New York regarding related-party transactions between the Master Fund and Bear Stearns entities located in New York.

107.    Walkers was compensated for services rendered to the Partnership directly by limited partners and for services rendered to the Master Fund indirectly *pro rata* by limited partners.

108.    According to an October 19, 2007, *Wall Street Journal* article, a securities expert stated that self-dealing by BSC without proper disclosure could be a "breach[] [of] fiduciary duty."

## V.    Defendants Knowingly Made False and Misleading Statements to Give False Comfort To Investors As The High-Grade Enhanced Fund Was Collapsing

109.    As the credit market began contracting in late 2006 and early 2007, the Management Defendants who are charged with stewardship of the High-Grade Fund and Enhanced High-Grade Fund assured investors that the woes plaguing the market (*e.g.*, the credit meltdown) would not hamper the Funds' ability to remain profitable.  According to a recent article appearing in *BusinessWeek*, Cioffi in February 2007 went so far as to declare to the Funds' investors that the Funds would be immune from a contracting credit market and actually earn a profit.  *See* Matthew Goldstein, "Bear Bets Wrong," *BusinessWeek*, Oct. 22, 2007.  Specifically, the article quotes Cioffi as saying, "***We're going to make money on this*** . . . . We don't believe what the markets are saying."  (Emphasis added.)  Tannin also joined in the promotion of the Funds by declaring to investors in March 2007 that "we wouldn't have made money in February if we were long, or overexposed, to subprime. . . ."  Tannin went on to say he was putting more of his own money into the funds, and that "it was a very bad time to redeem."

110.    However, according to an analysis of internal documents from the Funds conducted by *BusinessWeek*, Cioffi's and Tannin's public assurances simply did not correlate to the structure of the Funds:  "The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south."  Notwithstanding the Management Defendants' assurances, both the High-Grade Fund and the High-Grade Enhanced Fund began reporting losses shortly after Cioffi's and Tannin's endorsements of the Funds' ability to remain profitable.

111. Moreover, according to a December 18, 2007 *Wall Street Journal* article: "As late as April 25 . . . [in conference calls with investors] the two managers were telling investors that the amount of money investors were attempting to withdraw was lower than the amount of new money coming in. . . ."

112. In the April 25, 2007, call to investors Cioffi stated: "[I]n our portfolio, we feel comfortable that we have significantly hedged them [credit risks] and we have been hedging them." Cioffi further stated in that call: "[O]ur hedges did work. Our liquidity's there." He also stated that the "repo market has been very solid and very liquid."

113. In that call Cioffi also described BSAM's investment strategy as "very careful, very cautious, [and] very diligent."

114. In that call Tannin stated:

> [T]he way we structured the fund was (a) to limit the downside, so it wouldn't be, again, the number that we've, we'd always spoken about was a 10% drawdown and more importantly that we would not be forced sellers. So the structure of the fund has performed exactly the way it was designed to perform.

115. On the April 25 call, Cioffi and Tannin told investors that the "estimated returns for April are minus .6 basis points for the High Grade and negative .7 for Enhanced." Yet BSAM privately disclosed to Barclays that the High-Grade Enhanced Master Fund's month to date return on April 24, 2007, was actually -1.4%. BSAM further disclosed to Barclays that the High-Grade Enhanced Master Fund's month to date return on April 26, 2007 was -2.5%. In fact, both numbers were not accurate; BSAM later disclosed that the Master Fund dropped more than 10% in April 2007.

116. Virtually on the eve of the High-Grade Enhanced Fund's collapse, BSAM falsely represented that its investment strategy was working as planned and reported inflated returns on the High-Grade Enhanced Master Fund's investments.

28

117.    Federal prosecutors and the SEC are examining the circumstances surrounding the Funds' collapse.  In connection with the federal criminal probe, investigators have turned their attention to Cioffi and are examining whether Cioffi was seeking to minimize his exposure to the collapsing Funds by withdrawing his own money from the Partnership while assuring investors that the Master Fund would weather the credit meltdown and continue to perform.  According to the *Wall Street Journal*:

> Weeks before the two funds began imploding in April, fund manager Ralph Cioffi moved about $2 million of his own money from the riskier of the two hedge funds into another internal fund with a separate investment strategy. . . .

> Mr. Cioffi's move effectively lowered his exposure to the riskier of the two failed funds when it was on the brink of significant declines. . .

> Speaking to fund investors not long after the money transfer, Mr. Cioffi and a fellow fund manager still were publicly bullish about their two main funds, High-Grade Structured Credit Strategies Fund and a riskier sister fund [the Partnership].

118.    Thus, while investors were misled into believing that the market woes would not impact the High-Grade Enhanced Fund, Cioffi was withdrawing his own money out of the Partnership.  On June 19, 2008 Cioffi and Tannin were indicted and charged with conspiracy, securities fraud, and wire fraud for their role in the Defendants' scheme to defraud investors.

## VI.    The Partnership Collapses While Defendants Abdicate their Fiduciary Duties to Plaintiff and the other Limited Partners

119.    The mismanagement and self dealing manifested itself in a direct loss for investors.  Specifically, in a report to investors for March 2007, BSAM reported that the High-Grade Fund had returned an estimated -3.71%.  Commenting on the loss, the March 2007 BSAM report stated:

> March was a difficult month for the Fund, as we experienced our first negative return since we started the Fund in October of 2003.  Performance suffered in March for two reasons:  first, continued weakness in CDOs with exposure to sub-prime collateral caused additional mark downs in our long asset exposure; second,

our short positions rose in price as many investors who were short the sub-prime credit default index covered their positions. . . .

120.    In a June 8, 2007 report on the High-Grade Fund's performance, BSAM disclosed that the High-Grade Fund returned, on an unedited basis, -5.09%, and that this brought the year to date return as of April 30, 2007, to -6.24%.  Also, in the June 8, 2007 report, BSAM informed investors that it had decided not to accept additional subscriptions into the partnership at this time in light of current market conditions.

121.    The High-Grade Fund's negative returns were also experienced by the High-Grade Enhanced Fund.  In a June 2007 report on the Partnership's performance, the Partnership informed investors that it was down 23% for the year through April 2007.  According to a November 1, 2007 story in the *Wall Street Journal*, the Partnership's disclosure led to demands from investors to withdraw their investments.  *See* Kate Kelly, "Bear CEO's Handling Of Crisis Raises Issues," *Wall Street Journal*, Nov. 1, 2007.  In order to raise cash, both Master Funds began selling billions of dollars of the assets that they had acquired with borrowed money.  *Id.* The sudden selling of assets put more pressure on the Funds causing a steep decline in the Funds' values.  *Id.*  According to the *Journal*:

> In the first week of June, the more leveraged fund [the Partnership] told investors who wanted out that it couldn't immediately return their money.  Wall Street creditors that had lent the fund money reacted sharply to this news, making margin calls, or requests for additional collateral. One creditor, Merrill Lynch & Co., which was owed $400 million, seized the assets that backed its loan on June 15.

122.    The situation began to spiral as more lenders began calling in loans that they had previously made to the Funds.  Making matters worse, the Funds held only about 1% of their assets in cash, and not the normal 10% that many hedge funds keep on hand for emergencies.  Matthew Goldstein, "Bear Bets Wrong," *BusinessWeek*, Oct. 22, 2007.  *BusinessWeek* quoted

one structured-finance investor who described the Funds' cash to asset ratio as "not prudent investing." Indeed, these ratios violated the terms of the PPM and the LPA.

123.    Also undisclosed to investors, the Master Fund's investments were exceeding the limitations of Barclay's Leverage Instrument, thereby creating the imminent probability of Barclay's calling its 2.75 leverage of the Master Fund.  Indeed, as the true value of the Partnership's assets became apparent to Barclay's, it called its investment sending the Partnership into a spiral.

124.    On June 20, 2007, Merrill Lynch began selling $850 million in collateral it had seized from loans made to the High-Grade Fund and High-Grade Enhanced Fund.  On June 22, 2007, in a desperate move to stop the bleeding BSC stated that it would lend $3.2 billon to High-Grade Fund to support the collapsing fund.  Because the High-Grade Enhanced Master Fund was beyond saving, BSC did not make a similar contribution to attempt to save the Partnership.  Even for the High-Grade Master Fund, Bear Stearns' injection of cash was too little too late and could not overcome BSAM's willful mismanagement.

125.    On July 17, 2007 – approximately five months after Cioffi's and Tannin's assurances to investors – Bear Stearns CEO James E. Cayne ("Cayne") dispatched the following letter to the Partnership's investors, informing them that there was essentially no value remaining in the Master Fund:

> I want to take this opportunity to provide you with an update on the Bear Stearns High-Grade Structured Credit Strategies Fund and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund.  A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the Funds.  This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.
>
> As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet.  The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet

the outstanding margin obligations.  As a result, counterparties moved to seize collateral or otherwise terminate financing arrangements they had with the Funds. During June, the Funds experienced significant declines in the value of their assets resulting in losses of net asset value.  The Funds' reported performance, in part, reflects the unprecedented declines in the valuations of a number of highly-rated (AA and AAA) securities.

Fund managers and account executives have been informing the Funds' investors of the significant deterioration in performance for May and June.  The preliminary estimates show *there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007*.

*In light of these returns, we intend to seek an orderly wind-down of the Funds over time*.  This is a difficult development for investors in these Funds and it is certainly uncharacteristic of BSAM's overall strong record of performance.

Bear Stearns has been working to achieve the best possible outcome for investors under these circumstances.  On June 26th, Bear Stearns committed $1.6 billion in a collateralized repo line to the High-Grade Fund.  At this time, approximately $1.4 billion remains outstanding on this line and we continue to believe there are sufficient assets available in the High-Grade Fund to fully collateralize the repo facility.

At Bear Stearns, we have taken the performance of these two funds very seriously and have taken several important steps to restore your confidence in BSAM and affirm our commitment to serving you with excellence.  On June 29th, we announced that Jeff Lane was appointed chairman and chief executive officer of BSAM. Tom Marano, head of Bear Stearns' mortgage department, has been assigned to BSAM to aid in achieving orderly sales of the Funds' assets.  The risk management function at BSAM has been restructured so that it will now report up to Mike Alix, Bear Stearns' chief risk officer, creating an additional layer of oversight.  Mike Winchell, former head of risk management for Bear Stearns and most recently with Bear Wagner, has been engaged to consult with BSAM with regard to its hedge fund risk management function.

As a dedicated team addresses the issues with respect to these particular Funds, Jeff and the rest of the BSAM team remain fully focused on meeting your investment needs.

I have enormous confidence in BSAM and the ability of our talented professionals to bring you the highest quality products and services now and in the future.  You can count on us to deliver.

(Emphasis added.)

126.    Seeking to minimize its exposure to the High-Grade Fund's collapse, on July 26, 2007, BSC seized the collateral for the loan it had previously made to the High-Grade Fund.

127.    The collapse of the High-Grade Fund and Enhanced High-Grade Fund resulted in approximately $1.6 billion in investor losses.   The Funds filed for bankruptcy protection on August 1, 2007.

128.    During this collapse, several of Bear Stearns' top officials completely disregarded their duty to oversee the conduct of the Management Defendants thereby aiding in the Management Defendants' breaches of their duties to the Partnership.   For instance, the *Wall Street Journal* reported on November 1, 2007 that during ten critical days in the summer of 2007 when "[t]wo Bear hedge funds were hemorrhaging value;" "[i]nvestors were clamoring to get their money back;" and "[l]enders to the funds were demanding more collateral," Cayne was playing in a bridge tournament in Nashville, Tennessee.   The article went on to disclose that "[i]n the critical month of July, [Cayne] . . . spent 10 of the 21 workdays out of the office, either at the bridge event or golfing, according to golf, bridge and hotel records."   *See* Kate Kelly, "Bear CEO's Handling Of Crisis Raises Issues," *Wall Street Journal,* Nov. 1, 2007.   The article reported that Warren Spector ("Spector"), who was formerly the head of Bear Stearns' asset management business, was also in Nashville at the bridge tournament during this time.   In addition to overseeing Bear Stearns' asset management business, Spector was also responsible for ensuring adequate risk controls were in place in the asset management business.

129.    Further, according to the *Wall Street Journal*,  the shuttering of the High-Grade Enhanced Fund and the High-Grade Fund raised "questions about [Bear Stearns'] managerial oversight and risk controls."

## DERIVATIVE ALLEGATIONS

130.    Plaintiff brings the derivative counts for the benefit of the Partnership to redress injuries suffered by the Partnership as a direct result of the breaches of fiduciary duty by the Management Defendants.

131.    The Management Defendants, in committing the acts alleged herein, acted unlawfully and intentionally, were grossly negligent, mismanaged the business of the Partnership, and breached their fiduciary duties of loyalty, care, and disclosure to the Partnership and its limited partners.

132.    Plaintiff FIC, LLP has owned its limited partnership interest continuously during the wrongful course of conduct by the Defendants alleged herein, continues to own its limited partnership interest stock, and will retain its interest throughout the course of this litigation.

133.    Plaintiff will fairly and adequately represent the interests of the Partnership and the limited partners in enforcing and prosecuting their rights and have retained counsel competent and experienced in shareholder derivative litigation.

## DEMAND UPON THE GENERAL PARTNER IS EXCUSED AS FUTILE

134.    The General Partner of the Partnership is Defendant BSAM.  Plaintiffs have not made a demand upon BSAM to take remedial action on behalf of the Partnership against the defendants because BSAM participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

## COUNT I
**Breach of Fiduciary Duties**
**(Derivative Claim against the Management Defendants)**

135.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

136.    The Management Defendants owed fiduciary duties of care and loyalty to the Partnership in managing the Partnership's affairs.

137.    As alleged above, the Management Defendants breached their fiduciary duty to the Partnership through fraudulent self-dealing and recklessly, in bad faith, managing the affairs of the Partnership.

138.    These breaches proximately caused harm to the Partnership as it lost almost all its value due to mismanagement and self dealing.

139.    The Plaintiff did not make demand on the Partnership because such demand would be futile.  The General Partner of the Partnership, BSAM, is the primary wrongdoer that engaged in the breaches of fiduciary duty.

## COUNT II
**Aiding and Abetting Breaches of Fiduciary Duties**
**(Derivative Claim Against the Non-Management Defendants)**

140.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

141.    The Management Defendants owed a fiduciary duty to the Partnership.

142.    As alleged above, the Management Defendants breached their fiduciary duty to the Partnership through fraudulent self-dealing and recklessly, in bad faith, managing the affairs of the Partnership.

143.    The Non-Management Defendants knowingly participated in the Management Defendants' breaches of fiduciary duty.  The Non-Management Defendants had actual

knowledge of the breaches of fiduciary duty and substantially assisted the Management Defendants breach their fiduciary duty.

144.    These breaches proximately caused harm to the Partnership as it lost almost all its value due to mismanagement and self dealing.

### COUNT III
### Aiding and Abetting Breaches of Fiduciary Duties
### (Derivative Claim Against the Walkers Defendants)

145.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

146.    The Management Defendants owed the Plaintiff, Partnership, and other limited partners the fiduciary duties of care, good faith and unflinching loyalty.  That the Management Defendants owe the Plaintiff, Partnership, and other limited partners these fiduciary duties is well known to the Walkers Defendants.

147.    As is detailed in the preceding paragraphs, the Management Defendants have breached their fiduciary duties to the Plaintiff, Partnership, and other limited partners.

148.    The Walkers Defendants aided and abetted the Management Defendants' breaches of fiduciary duty.   Walkers Defendants actively and knowingly induced the Management Defendants to breach their fiduciary duties to the Partnership.  Walkers Defendants also colluded with the Management Defendants in their attempts to circumvent their fiduciary duties to the Partnership.

149.    Walkers Defendants colluded in or aided and abetted the Management Defendants' breaches of fiduciary duties, and were active and knowing participants in the Management Defendants' breaches of fiduciary duties owed to Plaintiff and the members of the Partnership.

150.    The Walkers Defendants failed to adequately supervise the Management Defendants' management of the Master Fund.  Among other things, the Walkers Defendants permitted the Management Defendants to engage in a systematic and continuous pattern of self-dealing.  In addition, the Walkers Defendants knowingly permitted the Management Defendants to cause the Master Fund to engage in harmful related-party transactions with BSAM entities without obtaining the approvals required to be given by the Independent Director Defendants.

151.    The Walkers Defendants participated in the breaches of the fiduciary duties by the Management Defendants for the purpose of advancing their own interests.

152.    The Partnership has been harmed by Walkers Defendants' aiding and abetting the Management Defendants' breaches of fiduciary duty.

153.    As a direct and proximate result of the Walkers Defendants' aiding and abetting the Management Defendants' breaches of fiduciary duty, the Partnership suffered injuries for which monetary damages are sought.

### COUNT IV
### Breach of Fiduciary Duties
### (Derivative Claim Against the Walkers Defendants)

154.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

155.    The Walkers Defendants owed fiduciary duties of care and loyalty to the Partnership.  There was a relationship of trust and confidence between the Partnership and the Walkers Defendants.  The PPM stated: "Members of the Board of Directors [of the Master Fund] who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Master Fund will have the responsibility for approving any transactions between the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest."

156.    As alleged above, the Walkers Defendants breached their fiduciary duty to the Partnership through recklessly or fraudulently failing to approve related party transactions entered into by the Partnership.

157.    These breaches proximately caused harm to the Partnership as it lost almost all its value due to mismanagement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Partnership, demands judgment as follows:

A.    Awarding the Partnership damages against all Defendants in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

B.    Awarding the Partnership punitive or exemplary damages to be determined at trial;

C.    Awarding the Partnership the costs of this suit, including reasonable attorneys' fees and other disbursements; and

D.    Awarding the Partnership such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 18, 2009

GRANT & EISENHOFER P.A.

By: _____
Jay W. Eisenhofer
James J. Sabella
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

**GARDY & NOTIS, LLP**

By: _____

Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2009, I caused a true and correct copy of the

**Second Amended Verified Derivative Complaint** to be served upon the following counsel by

electronic mail:

| | |
|---|---|
| Martin L. Seidel , Esq.<br>Cadwalader, Wickersham & Taft LLP<br>One World Financial Center<br>New York , NY 10281<br>212.504.5643<br>Fax: 212.504.6387<br>Email: martin.seidel@cwt.com<br><br>-representing Walkers Fund Svcs. Ltd., Scott Lennon and Michelle Wilson-Clarke | Barry H Berke<br>Kerriann Law<br>Stephen Matthew Sinaiko<br>Jason Moff<br>Kramer Levin Naftalis & Frankel, LLP<br>1177 Avenue of the Americas<br>New York , NY 10036<br>212-715-9100<br>Email: bberke@kramerlevin.com<br>klaw@kramerlevin.com<br>ssinaiko@kramerlevin.com<br>jmoff@kramerlevin.com<br><br>-representing Defendant Bear Stearns entities |
| Edward J. M. Little<br>Lisa Ann Cahill<br>Jason Andrew Masimore<br>Hughes Hubbard & Reed LLP<br>One Battery Park Plaza<br>New York , NY 10004<br>(212)-837-6400<br>Fax: (212)-299-6400<br>Email: little@hugheshubbard.com<br>cahill@hugheshubbard.com<br>masimore@hugheshubbard.com<br><br>-representing Defendant Ralph Cioffi | Catherine L. Redlich<br>Driscoll & Redlich<br>521 Fifth Avenue, Suite 3300<br>New York , NY 10175<br>212 986-4030<br>Fax: (212)-986-4050<br>Email: credlich@driscollredlich.com<br><br>-representing Defendant Raymond McGarrigal |

Nina Minard Beattie
Theresa Marie Trzaskoma
Brune & Richard LLP
80 Broad Street, 30th Floor
New York , NY 10004
212-668-1900
Fax: 212-668-0315
Email: nbeattie@bruneandrichard.com
ttrzaskoma@bruneandrichard.com

-representing Defendant Matthew Tannin

James J. Sabella